# UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| QUITO BARAJAS and TYLER LANGE, on behalf of themselves and all others similarly situated,<br><br>        Plaintiffs,<br><br>v.<br><br>ATLAS OBSCURA INC.<br>        Defendant. | Case No.:  1:25-cv-302<br><br>**CLASS ACTION COMPLAINT** |

Plaintiffs Quito Barajas and Tyler Lange ("Plaintiffs"), individually and on behalf of all others similarly situated, by and through his undersigned counsel, brings this class action complaint against Defendant Atlas Obscura Inc. ("Atlas Obscura" or "Defendant"), which owns and manages a travel website at https://www.atlasobscura.com/ (the "Website"). On the Website, Defendant utilized tracking tools to intercept and disclose consumers' search terms, video watching information, and personally identifiable information (collectively, "Sensitive Information") without seeking or obtaining consumers' consent (the "Tracking Tools"). Defendant's use of the Tracking Tools resulted in violations of the Video Privacy Protection Act ("VPPA"), federal and state wiretap laws, and invasions into consumers' privacy. Plaintiffs allege the following upon information and belief based on the investigation of counsel, except for those allegations that specifically pertain to Plaintiffs, which are alleged upon personal knowledge.

1

## NATURE OF THE ACTION

1.      This is a class action brought on behalf of all persons who subscribed to the Website and subsequently watched pre-recorded video materials on the Website.

***Video Privacy Violations***

2.      The Website allows visitors to use the Website's built-in search bar to search for videos ("Visitors"). Individuals also have the ability to sign up for paid memberships to the Website and to free e-newsletters (the "Subscribers," collectively with Visitors, "Users").[1]

3.      Videos are embedded within articles provided on the Website and as stand-alone content throughout the Website, providing information on hidden places, history, scientific marvels, and gastronomical wonders.

4.      In short, Defendant is in the business of providing pre-recorded videos to Subscribers.

5.      In all instances, the searching and watching of Defendant's videos are monitored by third parties as a result of Defendant's decision to place the Tracking Tools on each individual page containing Defendant's video materials on the Website.

6.      Defendant does not disclose on the Website that Users' Sensitive Information, including Personally Identifiable Information ("PII"),[2] would be captured by the Tracking Tools, and then transmitted to third parties.

7.      The Website does not inform Users that their Sensitive Information will be exposed, available, and readily usable by any person of ordinary technical skill who receives that data.

8.      At no point during or after the account sign up process does Defendant seek or obtain consent for the sharing of Users' Sensitive Information, which Defendant surreptitiously gathered through the use of the Tracking Tools that it chose to employ on the Website. None of

---

[1] *Newsletters*, ATLAS OBSCURA, https://www.atlasobscura.com/newsletters (last visited Jan. 15, 2025).
[2] PII encompasses information able to identify users, as well as the title, description, or summary of video materials or services requested or obtained from a video tape service provider. *See* 18 U.S.C. § 2710(a)(3).

Defendant's terms of use reviewed as part of the investigation in connection with the preparation of this Complaint—irrespective of whether or how the terms are presented to Users—warned Users that their Sensitive Information will be disclosed to third parties.

9.      Data sharing policies for a service or subscription is an important factor for individuals deciding whether to provide personal information to that service.  Congress has recognized the immediate and irreversible harm caused by associating a person's personally identifiable information in conjunction with a list of specific audio-visual materials they have requested or consumed.

10.     Congress's enactment of the VPPA and its continued endorsement of the statute, supports that recognition. The VPPA prohibits video tape service providers,[3] such as the Defendant, from sharing PII without valid consent.

11.     Congress made clear that harm to an individual impacted by a VPPA violation occurs the moment, and each time, a consumer's information is shared.

12.     Defendant purposefully implemented and utilized Meta, Inc.'s ("Facebook" or "Meta") tracking pixel (the "Pixel," discussed and defined herein) to track user activity on the Website and disclose that information, including Subscribers' PII, to Facebook to gather valuable marketing data. The Pixel cannot be placed on the Website without steps taken directly by Defendant (e.g., by a website manager).  The Pixel cannot be placed on the Website by Facebook without the knowledge and cooperation of the Defendant.

13.     Only as a direct result of Defendant's decision to employ the Pixel on its video content on the Website, a Subscriber's PII is shared *the moment* the consumer requests video materials.[4]

---

[3] 18 U.S.C. § 2710(a)(4).

[4] As defined by the VPPA, protected "personally identifiable information" includes information which identifies a person as having "*requested* or obtained" video materials.  *See* 18 U.S.C. § 2710(a)(3). When a website user clicks a link leading to a video, the user "requests" authorization to access the material from the website's server and, if authorized, the server then sends the data to the user. *See How the Web works*, MOZILLA https://developer.mozilla.org/en-US/docs/Learn/Getting_started_with_the_web/How_the_Web_works  (last visited January 15, 2025).

14.     Defendant does not seek consent from Users to utilize the Pixel to track, share, and exchange their Sensitive Information with Facebook.

15.     Defendant knew, or, at a minimum, was directly told that the Pixel resulted in Users' Sensitive Information being shared (resulting in VPPA and Wiretap Act violations), and that it failed to obtain Users' consent to allow its Pixel to operate in a way that shares their protected information with Facebook.

16.     Federal legislatures addressed citizens privacy expectations when communicating with parties over wired communications.

***Wiretap Violations***

17.     Congress passed the Federal Wiretap Act, which prohibits the unauthorized interception of electronic communications.

18.     Defendant purposefully implemented and utilized the Tracking Tools to intercept and read the search terms and disclose the location and content of webpages visited by Users.

19.     Users of the Website, such as Plaintiffs, have an interest in maintaining control over their private and sensitive information, such as their PII and search terms, as well as an interest in preventing their misuse.

20.     Users of the Website have been harmed as a result of Defendant's violations of the VPPA, state and federal wiretap laws, and had their privacy invaded. In addition to monetary damages, Plaintiffs seek injunctive relief requiring Defendant to immediately (i) remove the Tracking Tools from the Website, or (ii) add, and obtain, the appropriate consent from Users; or (iii) otherwise anonymize video titles in URLs, parameters, and metadata and/or has Users' Facebook user IDs ("FIDs," discussed and defined herein) in the Pixel transmissions.

21.     Plaintiffs' claims are brought as a class action, pursuant to Federal Rule of Civil Procedure 23, on behalf of themselves and all other similarly situated persons. Plaintiffs seek relief in this action individually and on behalf of Users of the Website for violations of the VPPA and the Wiretap Act.

**PARTIES**

22.    Plaintiff Quito Barajas is a citizen of California and resides in Chula Vista, California. Plaintiff Barajas became a paid subscriber and newsletter subscriber to the Website in or around 2020.  After becoming a subscriber to the Website, Plaintiff Barajas requested video content on the Website on various occasions and dates, specifically from January 2023 to April 2023 when he requested content on obscure places and unique events. Plaintiff Barajas accessed the Website through a Safari browser while logged into his Facebook account. Plaintiff Barajas's Facebook profile includes his real name, personal photos, and the name of his business. The Website did not obtain Plaintiff Barajas's permission before sending Plaintiff Barajas's Sensitive Information to third parties.

23.    Plaintiff Tyler Lange is a citizen of Illinois and resides in Chicago, Illinois. Plaintiff Lange became a subscriber to the Website in or around 2023. After becoming a subscriber to the Website, Plaintiff Lange requested video content on the Website on various occasions and dates, specifically content on unique things to do in South Dakota before his trip there. Plaintiff Lange recalls requesting video content on the Website as recently as July 2023. Plaintiff Lange accessed the Website through a Chrome browser while logged into his Facebook account. Plaintiff Lange's Facebook profile includes his real name, personal photos, where he lives, and his work and education history. The Website did not obtain Plaintiff Lange's permission before sending Plaintiff Lange's Sensitive Information to third parties.

24.    Defendant Atlas Obscura Inc. is a travel and exploration company that publishes stories about "hidden places, history, scientific marvels and gastronomical wonders."[5] Defendant owns and operates the Website. Atlas Obscura, through the Website provides various Newsletter options to subscribe to, including the: 1) Daily Newsletter, which provides a daily digest of popular stories, discoveries, and hidden places; 2) Weekly Newsletter, which provides a weekly digest of popular stories, places and foods; 3) Places Newsletter, which provides a spotlight on

---

[5] *About*, ATLAS OBSCURA, https://www.atlasobscura.com/about (last visited January 15, 2025).

fascinating places thrice a week; 4) Gastro Obscura Newsletter, which provides updates on intriguing foods and drinks twice a week; 5) Atlas Obscura Courses, which provides alerts about upcoming online courses and promotions; and 6) Atlas Obscura Small Group Trips, which provides alerts on newest trips, travel inspiration, and more.[6] The paid subscription to the Atlas Obscura Membership Program provides Subscribers with exclusive access to benefits, including a monthly members-only newsletter, fewer ads and no pop-ups, and a $100 credit towards Subscribers' next Atlas Obscura Trip.[7] Atlas Obscura is headquartered at 61 Greenpoint Avenue, Suite 302, Brooklyn, New York 11122.

## JURISDICTION AND VENUE

25.    This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(d) because there are more than 100 Class Members; the aggregate amount in controversy exceeds $5,000,000.00, exclusive of interest, fees, and costs; and at least one Class Member is a citizen of a state different than Defendant.

26.    This Court has original jurisdiction under 28 U.S.C. § 1331 based on Plaintiffs' claims under the Video Privacy Protection Act, 18 U.S.C. § 2710, et seq. and the Federal Wiretap Act, 18 U.S.C. § 2511(1) (a)-(e).

27.    This Court has personal jurisdiction over Defendant because Defendant derives revenue in the State of New York, including Defendant's revenue generated from its management and operational control over the Website, as well as the revenue sharing, advertising sales, etc. that Defendant derives from the Website. Defendant further does business and derives revenue by offering membership subscription plans on its website within the state of New York. Defendant's collection and dissemination of Plaintiffs' Sensitive Information giving rise to this lawsuit occurred

---

[6] *Newsletters*, ATLAS OBSCURA, https://www.atlasobscura.com/newsletters (last visited January 15, 2025).

[7]                              *Membership*,                      ATLAS                      OBSCURA, https://www.atlasobscura.com/membership#:~:text=Become%20a%20Member,%24500/year (last visited January 15, 2025).

in this District, and the conduct giving rise to this action arose out of and relates to conduct and business in this District.

28.    Venue is proper in this District pursuant to 28 U.S.C. § 1391 because Defendant conducts substantial business operations in this District, including managing the Website, delivering video content, and Defendant's U.S.-based marketing.

## FACTUAL BACKGROUND

### I.    The VPPA

29.    President Ronald Reagan's nomination of Judge Robert Bork to the United States Supreme Court prompted the legislation which led to the VPPA. During the confirmation process, a reporter requested Judge Bork's movie rental history from a movie rental establishment. The employee disclosed to Judge Bork's movie rental history to the Washington City Paper, which then published that history. Congress responded by passing the VPPA, with an eye toward the digital future. As Senator Patrick Leahy, who introduced the Act, explained:

> It is nobody's business what Oliver North or Robert Bork or Griffin Bell or Pat Leahy watch on television or read or think about when they are home. In an area of interactive television cables, the growth of computer checking and check-out counters, of security systems and telephones, all lodged together in computers, it would be relatively easy at some point to give a profile of a person and tell what they buy in a store, what kind of food they like, what sort of television programs they watch, who are some of the people they telephone. I think that is wrong.

S. Rep. 100-599, at 5-6 (internal ellipses and brackets omitted).

30.    Senators were particularly troubled by disclosures of records that reveal consumers' purchases and rentals of videos and other audio-visual materials. As Senator Patrick Leahy and the late Senator Paul Simon recognized, records of this nature offer "a window into our loves, likes, and dislikes," such that "the trail of information generated by every transaction that is now recorded and stored in sophisticated record-keeping systems is a new, more subtle and pervasive form of surveillance." S. Rep. No. 100-599 at 7-8 (1988) (statements of Sens. Simon and Leahy, respectively).

31.    In 2012, Congress amended the VPPA, and in so doing, reiterated the Act's applicability to "so-called 'on-demand' cable services and Internet streaming services [that] allow consumers to watch movies or TV shows on televisions, laptop computers, and cell phones." S. Rep. 112-258, at 2.

32.    During a recent Senate Judiciary Committee meeting, "The Video Privacy Protection Act: Protecting Viewer Privacy in the 21st Century," Senator Leahy stated that "[w]hile it is true that technology has changed over the years, we must stay faithful to our fundamental right to privacy and freedom. Today, social networking, video streaming, the 'cloud,' mobile apps and other new technologies have revolutionized the availability of Americans' information."[8]

33.    The VPPA prohibits "[a] video tape service provider who knowingly discloses, to any person, personally identifiable information concerning any consumer of such provider." 18 U.S.C. § 2710(b)(1).

34.    The VPPA defines personally identifiable information ("PII") as "information which identifies a person as having requested or obtained specific video materials or services from a video service provider." 18 U.S.C. § 2710(a)(3).

35.    A video tape service provider ("VTSP") is "any person, engaged in the business, in or affecting interstate or foreign commerce, of rental, sale, or delivery of prerecorded video cassette tapes or similar audio-visual materials." 18 U.S.C. § 2710(a)(4). Courts have interpreted the definition for VTSPs broadly.

36.    VTSPs are not required to deal exclusively in audio visual content; rather, audiovisual content need only be part of the provider's book of business. *Salazar v. Nat'l Basketball Ass'n*, 118 F.4th 533, 547-48 (2d Cir. 2024).

37.    A consumer is "any renter, purchaser, or subscriber of goods or services from a video tape service provider[.]" 18 U.S.C. § 2710(a)(1).

---

[8] See *Committee on the Judiciary, Subcommittee on Privacy, Technology and the Law, The Video Privacy Protection Act: Protecting Viewer Privacy in the 21st Century*, SENATE JUDICIARY COMMITTEE SUBCOMMITTEE ON PRIVACY, TECHNOLOGY AND THE LAW, https://www.judiciary.senate.gov/download/hearing-transcript_-the-video-privacy-protection-act-protecting-viewer-privacy-in-the-21st-century (last visited January 15, 2025).

38.    In interpreting the definition of VTSPs, the *Salazar* Court also reasoned that 'consumer' should be understood to encompass a renter, purchaser, or subscriber of *any* of the provider's 'goods or services'—audiovisual or not. *Salazar*, 118 F.4th at 548-49.

39.    The VPPA also prohibits the disclosure of PII which identifies the title or description of the audio-visual material for marketing goods and services. 18 U.S.C. § 2710(b)(2)(D)(ii).

40.    VTSPs may obtain consent from consumers to disclose information where that consent: (1) is in a form distinct and separate from any form setting forth other legal or financial obligations of the consumer (18 U.S.C. § 2710(b)(2)(B)(i)); (2) at the election of the consumer in advance of up to 2 years or when the disclosure is sought (18 U.S.C. § 2710(b)(2)(B)(ii)); and (3) if the VTSP provided the consumer with a clear and conspicuous opportunity to withdraw consent on a case-by-case basis or withdraw from ongoing disclosures at the consumer's election (18 U.S.C. § 2710(b)(2)(B)(iii)).

41.    Under the statute, for each violation of the statute, a court may award actual damages (but not less than liquidated damages of $2,500.00 per person), punitive damages, equitable relief, and attorney's fees.

42.    Defendant here is a video service provider in that it provided access to pre-recorded audio-visual materials to Users, including Plaintiffs and Class Members, on its Website.

43.    The relationship between Plaintiffs and Defendant is precisely the type of relationship contemplated by the VPPA.

44.    In this case, Defendant knowingly and systematically disclosed Plaintiffs' PII to Meta, without obtaining their consent, by purposely placing the Pixel on the Website with the knowledge it would collect user information.

## II.    The Wiretap Statutes

### A. The Federal Wiretap Act

45.    The Federal Wiretap Act (the "Wiretap Act") "as a response to Fourth Amendment concerns surrounding the unbridled practice of wiretapping to monitor telephonic

communications."[9]  The Wiretap Act primarily concerned the government's use of wiretaps but was amended in 1986 through the Electronic Communications Privacy Act ("ECPA") to provide a private right of action for private intrusions as though they were government intrusions.[10]

46.    Congress was concerned that technological advancements like "large-scale mail operations, computer-to-computer data transmissions, cellular and cordless telephones, paging devices, and video teleconferencing"[11] were rendering the Wiretap Act out-of-date. Congress amended the Wiretap Act in 1986 through the Electronic Communications Privacy Act ("ECPA") to provide a private right of action for private intrusions as though they were government intrusions.[12]

47.    As a result, the ECPA primarily focused on two types of computer services that were prominent in the 1980s: (i) electronic communications like email between users; and (ii) remote computing services like cloud storage or third-party processing of data and files.[13]

48.    Title I of the ECPA amended the Wiretap Act such that a violation occurs when a person or entity: (i) provides an electronic communication service to the public; and (ii) intentionally divulges the contents of any communication; (iii) while the communication is being transmitted on that service; (iv) to any person or entity other than the intended recipient of such communication.

49.    While the ECPA allows a single party to consent to the interception of an electronic communication, single party consent is only acceptable where the communication is not "intercepted for the purpose of committing any criminal or tortious act in violation of the Constitution or laws of the United States or of any State." 18 U.S.C. §2511(2)(d).

---

[9] Hayden Driscoll, *Wiretapping the Internet: Analyzing the Application of the Federal Wiretap Act's Party Exception Online*, 29 WASH. & LEE J. C.R. & SOC. JUST. 187, 192 (2022) (available at: https://scholarlycommons.law.wlu.edu/cgi/viewcontent.cgi?article=1541&context=crsj) (last visited on January 15, 2025).
[10] *Id.*
[11] Senate Rep. No. 99-541, at 2 (1986).
[12] Driscoll, *supra* note 13.
[13] *In re Zynga Privacy Litig.*, 750 F.3d 1098, 1103 (9th Cir. 2014).

50.     While communicating with Defendant on the Website, Users had the contents[14] of their communications with Defendant intercepted by third parties via the Tracking Tools.

51.     Defendant purposefully included the Tracking Tools on the Website to intercept Plaintiffs' communications and redirect them to third parties to improve the effectiveness of their and the third parties' advertising and marketing.

52.     Plaintiffs did not know of or consent to the exposure of their legally protected communications with Defendant to third parties.

53.     Defendant acted with the intent to have Plaintiffs' communications intercepted by third parties to use Users' protected, private information for its economic benefit through monetizing the information via targeted advertising and other means.

**B. California Invasion of Privacy Act**

54.     CIPA was enacted in 1967 "to protect the right of privacy of the people of [California]."[15] The California legislators were concerned about emergent technologies that allowed for the "eavesdropping upon private communications," believing such technologies "created a serious threat to the free exercise of personal liabilities and cannot be tolerated in a free and civilized society."[16]

55.     CIPA is regularly recognized as California's analog to the Federal Wiretap Act, comprised of the same general elements and protect against the same general harms.

56.     To protect people's privacy, legislators broadly protected wired and aural communications being sent to or received from California.[17]  Notably, for wired communications, California set out to prohibit (i) intentional wiretapping or (ii) willful attempts to learn the contents of wired communications, (iii) attempts to use or transmit information obtained through

---

[14] The contents of Plaintiffs and Users' communications include: 1) search terms submitted to the site; 2) the location and contents of webpages visited by users; and 3) the PII discussed in Section IV.
[15] Cal. Penal Code § 630
[16] Id.
[17] Cal. Penal Code § 631-32.

wiretapping, or (vi) aiding, agreeing with, employing, or conspiring with any person(s) to unlawfully do, permit, or cause the preceding three wrongs.[18]

57.    CIPA claims are often treated as analogous to Wiretap Act claims.[19]

### III.    How Websites Function

58.    Websites are hosted on servers. Websites' files are stored on and accessed from servers. Websites are, in part, "run" on a user's internet browser, as the browser loads and processes the website's code to display the webpage.

59.    Websites are a collection of webpages. A webpage is essentially a document containing text written in HyperText Markup Language (HTML) code.[20]

60.    Each webpage has a unique address, and two webpages cannot be stored at the same address.[21]

61.    When a user navigates to a webpage (by entering a URL address directly or clicking a hyperlink containing the address), that user's browser contacts the DNS (Domain Name System) server, which translates the web address of that website into a unique IP (Internet Protocol) address.[22]

62.    An IP address is "a unique address that identifies a device on the internet or a local network."[23] Essentially, an IP address is:

> The identifier that allows information to be sent between devices on a network: they
> contain location information and make devices accessible for communication. The

---

[18] *Mastel v. Miniclip SA*, 549 F. Supp. 3d 1129, 1134 (E.D. Cal. 2021) (citing *Tavernetti v. Superior Ct.*, 22 Cal. 3d 187, 192 (1978)).

[19] Courts frequently look to the Federal Wiretap Act when analyzing a wiretapping claim under CIPA. *Gladstone v. Amazon Web Services, Inc.*, No. 2:23-CV-00491-TL, 2024 WL 3276490 (W.D. Wash. July 2, 2024) (citing *Brodsky v. Apple Inc.*, 445 F. Supp. 3d 110, 127 (N.D. Cal. 2020); *In re Facebook, Inc. Internet Tracking Litig.*, 956 F.3d 589, 607 (9th Cir. 2020)).

[20] *What is the difference between webpage, website, web server, and search engine?*, MOZILLA, https://developer.mozilla.org/en-US/docs/Learn/Common_questions/Web_mechanics/Pages_sites_servers_and_search_engines (last visited January 15, 2025).

[21] *Id.*

[22] *How the web works*, MOZILLA, https://developer.mozilla.org/en-US/docs/Learn/Getting_started_with_the_web/How_the_Web_works (last visited January 15, 2025).

[23] *What is an IP Address – Definition and Explanation*, KASPERSKY, https://usa.kaspersky.com/resource-center/definitions/what-is-an-ip-address (last visited January 15, 2025).

internet needs a way to differentiate between different computers, routers, and websites. IP addresses provide a way of doing so and form an essential part of how the internet works.

*Id.*

63.     When a user's browser navigates to a webpage, it sends an HTTP request to the server identified by the webpage's IP address. This request is for the specific resource located at the URL. If the server fulfils this request, it issues an HTTP response, which includes the status of the request and, typically, the requested content. This content is then transmitted in small chunks, known as data packets, and reassembled into the complete webpage upon arrival by the user's browser.[24]

64.     This Request URL includes a domain name and path, which identify the specific content being accessed on a website and its location within the website's structure.

65.     The Request URL typically contains parameters.  Parameters are values added to a URL to transmit data to the recipient, prefaced by a question mark to signal the use of parameters. Parameters direct a web server to provide additional context-sensitive services,[25] as depicted below:



*Figure 1 - Mozilla's diagram of a URL, including parameters[26]*

66.     The user's browser then assembles the small chunks back into HTML, which is then processed by the user's browser and "rendered" into a visual display according to the

---

[24] *Id.*
[25] To see examples of how Atlas Obscura used parameters to provide additional information here, *see, infra,* Section IV.
[26] *What is a URL?*, MOZILLA, https://developer.mozilla.org/en-US/docs/Learn/Common_questions/What_is_a_URL (last visited January 15, 2025).

instructions of the HTML code.[27]  This is the visible, and usually interactable, website that most people think of.

67.    To provide more complex website functionalities, website developers will include more complex commands written in other computer programming languages such as JavaScript snippets within the HTML documents.[28]

68.    Such complex tasks include streaming videos by the Users or subscribing to Newsletters/ Digital Magazine, or code used to monitor and report user activity.

**IV.    The Website and the Tracking Tools**

69.    Defendant utilized Tracking Tools on its Website, including those created by Facebook, Google, Amazon, Pinterest, Rubicon Project, Parse.ly, Keywee, and others (collectively, the "Tracking Entities"), to intercept and disclose Subscribers' Sensitive Information without seeking or obtaining Subscribers' consent.

**A.  The Facebook Pixel**

70.    Facebook is a "real identity platform"[29] Users are allowed only one account and must share "the name they go by in everyday life."[30] To meet that goal, Facebook requires users, when creating an account, to provide their first and last name, along with their birthday and gender.[31]

71.    Facebook monetizes users by selling advertisers access to their Facebook feeds.[32]

---

[27] *Id.*

[28]    *See    JavaScript    Basics*,    MOZILLA,    https://developer.mozilla.org/en-US/docs/Learn/Getting_started_with_the_web/JavaScript_basics (last visited  January 15, 2025).

[29] Sam Schechner and Jeff Horwitz, *How Many Users Does Facebook Have? The Company Struggles to Figure It Out*, WALL. ST. J. (Oct. 21, 2021 4:05 PM). https://www.wsj.com/articles/how-many-users-does-facebook-have-the-company-struggles-to-figure-it-out-11634846701 (last visited  January 15, 2025).

[30]    *Community    Standards,    Part    IV    Integrity    and    Authenticity*,    FACEBOOK, https://www.facebook.com/communitystandards/integrity_authenticity (last visited  January 15, 2025).

[31] *Sign Up*, FACEBOOK, https://www.facebook.com/ (last visited  January 15, 2025).

[32]  Mike Isaac, *Facebook's profit surges 101 percent on strong ad sales.*, N.Y. TIMES (July 28, 2021), https://www.nytimes.com/2021/07/28/business/facebook-q2-earnings.html (last visited  January 15, 2025).

72.    Facebook's advertising capabilities are valuable because of its ability to effectively target users with meaningful or relevant advertising.[33] Facebook can target users so effectively because it monitors and analyzes user activity both on and off its site.[34] This allows Facebook to infer details about users beyond what users explicitly disclose, like their "interests," "behavior," and "connections."[35] Facebook compiles this information into a generalized dataset called "Core Audiences," which advertisers can sort through using highly specific filters and parameters to make sure their targeted advertisements are aimed at users likely to positively respond.[36]

73.    Advertisers can build "Custom Audiences,"[37] which enable advertisers to reach "people who have already shown interest in [their] business, whether they're loyal customers or people who have used [their] app or visited [their] website."[38] Meta's Custom Audience feature enables the direct targeting of existing customers and to build "Lookalike Audiences," which "leverages information such as demographics, interests, and behavior from your source audience to find new people who share similar qualities."[39] Unlike Core Audiences, Custom Audiences require an advertiser to supply users' data to Facebook. Advertisers can do so through two mechanisms: by manually uploading contact information for customers in the form of "lists," or by utilizing Facebook's "Business Tools," which collect and transmit the data automatically.[40]

---

[33]    *Why Advertise on Facebook*, FACEBOOK, https://www.facebook.com/business/help/742478679120153?id=1205376682832142 (last visited January 15, 2025).
[34]    *About Facebook Pixel*, FACEBOOK, https://www.facebook.com/business/help/742478679120153?id=1205376682832142 (last visited January 15, 2025).
[35]    *Ad Targeting: Help your ads find the people who will love your business,* FACEBOOK, https://www.facebook.com/business/ads/ad-targeting (last visited January 15, 2025).
[36]    *Easier, More Effective Ways to Reach the Right People on Facebook*, FACEBOOK, https://www.facebook.com/business/news/Core-Audiences (last visited January 15, 2025).
[37]    *About Custom Audiences*, FACEBOOK, https://www.facebook.com/business/help/744354708981227?id=2469097953376494 (last visited January 15, 2025).
[38]    *About Events Custom Audience*, FACEBOOK, https://www.facebook.com/business/help/366151833804507?id=300360584271273 (last visited January 15, 2025).
[39]    *About Lookalike Audiences*, FACEBOOK, https://www.facebook.com/business/help/164749007013531?id=401668390442328 (last visited January 15, 2025).
[40]    *Create a Customer List Custom Audience*, FACEBOOK, https://www.facebook.com/business/help/170456843145568?id=2469097953376494 (last visited January 15, 2025); *Create a Website Custom Audience*, FACEBOOK, https://www.facebook.com/business/help/1474662202748341?id=2469097953376494 (last visited January 15, 2025).

74.    Here, Defendant employed both methods of supplying user information to Meta.

75.    Meta's "Business Tools" allow web developers to monitor user interactions on their websites, which can then be shared with Meta. For example, Meta offers a tracking Pixel (the "Pixel") and the Conversions API. Where "the Pixel lets you share web events from a web browser[,] . . . the Conversions API lets you share web events directly from your server."[41]

76.    The Pixel is a piece of code that advertisers, like Defendant, can integrate into its website. Once activated, the Pixel "tracks the people and type of actions they take."[42] When the Pixel captures an action, it sends a record of the action to Facebook. After receiving the Pixel transmission sent by an advertiser, Facebook processes it, analyzes it, and assimilates it into datasets like the Core Audiences and Custom Audiences.

77.    After processing the data, Meta also makes much of the data available to the advertisers through the "Event Manager" tool.[43]

78.    However, to make use of the Pixel, Defendant must first agree to the Meta Business Tools Terms.

79.    The Meta Business Tools Terms directly inform Pixel users how the Pixel operates.

80.    Meta explicitly informs Pixel users that using the Pixel will result in Facebook receiving users' information "that personally identifies [them] . . . " ("Contact Information") and information "about [users] and the actions they take on your websites . . ." ("Event Data").[44] The terms also warn website developers that Facebook will "process the Contact Information solely to match the Contact Information against" FIDs, "as well as to combine those [FIDs] with corresponding Event Data."[45]

---

[41] *Business Help Center: About deduplication for Meta Pixel and Conversions API events*, FACEBOOK, https://www.facebook.com/business/help/823677331451951?id=1205376682832142 (last visited January 15, 2025).

[42] *Retargeting*, FACEBOOK, https://www.facebook.com/business/goals/retargeting (last visited January 15, 2025).

[43] *About Meta Events Manager*, FACEBOOK, https://www.facebook.com/business/help/898185560232180?id=1205376682832142 (last visited January 15, 2025).

[44] *Meta Business Tools Terms*, *Section 1(a)(i)-(ii)*, FACEBOOK, https://www.facebook.com/legal/businesstech?paipv=0&eav=AfY4CZdRHnQNL2-VtXBCcMUcg-6J-5jU8AL4hOLViKhAWi-SbNmA4QuXlc6yyk877eY&_rdr (last visited January 15, 2025).

[45] *Id.* at Section 2(a)(i)(1).

81.    Meta also requires Pixel users to "represent and warrant that [they] . . . have all the necessary rights and permissions and a lawful basis (in compliance with all applicable laws, regulations and industry guidelines) for the disclosure and use of Business Tool Data."[46]

82.    Additionally, Meta requires Pixel users to "represent and warrant that [they] will not share Business Tool Data with [Meta] that . . . includes . . . categories of sensitive information (including any information defined as sensitive under applicable laws, regulations and applicable industry guidelines)." [47]

83.    Meta explains to its Business Tools users – including Defendant – that the Pixel combines users' identifying information with their activity on websites to build marketing profiles and, as a result, that websites should not share sensitive information using the Pixel.

84.    Despite Meta's warnings, advertisers ultimately have control over what actions— or, as Facebook calls it, "events"—the Pixel will be active for on websites. These events, in turn, determine what data is collected, including the website's query string parameters, metadata, and what pages a User views.[48]

85.    Advertisers can also configure the Pixel to track events other than Meta's menu of "standard events," which contain events that can track what content a User views or purchases.[49] An advertiser can also create their own "custom events," allowing them to track designated user activity and data through events programmed specifically for that purpose on an advertiser's website.[50]

---

[46] *Id.* at Section 1(e).
[47] *Id.* at Section 1(h).
[48]    *See    Facebook    Pixel,    Accurate    Event    Tracking,    Advanced*,    FACEBOOK, https://developers.facebook.com/docs/facebook-pixel/advanced/ (last visited January 15, 2025); *see also Best Practices    for    Facebook    Pixel    Setup*,    FACEBOOK, https://www.facebook.com/business/help/218844828315224?id=1205376682832142 (last visited January 15, 2025).
[49]    *Specifications    for    Facebook    Pixel    Standard    Events*,    FACEBOOK, https://www.facebook.com/business/help/402791146561655?id=1205376682832142 (last visited January 15, 2025).
[50]    *About    Standard    and    Custom    Website    Events*,    FACEBOOK, https://www.facebook.com/business/help/964258670337005?id=1205376682832142 (last visited January 15, 2025).

86. Advertisers also control how the Pixel identifies Users. The Pixel is configured to automatically collect "HTTP Headers" and "Pixel-specific Data."[51]

87. HTTP Headers include "IP addresses, information about the web browser, page location, document, referrer and data potentially identifying persons using the website."[52]

88. Pixel-specific Data includes "the Pixel ID and cookie[s],"[53] which can also identify persons using the website.

89. Once a Pixel activates, it copies relevant information from the communication between the user and website, such as URLs, user activity, search terms, metadata, query string parameters, and cookies, bundles that information together, and transmits that copied bundle to Meta through a "GET" or "POST" HTTP request.

### 1. Atlas Obscura Implemented the Pixel to Share Subscribers' PII

90. Atlas Obscura implemented the Pixel on the Website.

91. Defendant added the Pixel to the Website, which it used to track Subscribers throughout their use of the Website and through the purchased subscription process.

92. The Pixel tracks user-activity on web pages by monitoring events,[54] which when triggered, causes the Pixel to automatically send data – here, Subscribers' PII – directly to Facebook.[55] An example of an event utilized by websites include a user loading a page with a Pixel installed (the "PageView event").[56] Defendant utilizes PageView events on the Website.[57]

---

[51] *Facebook Pixel*, FACEBOOK, https://developers.facebook.com/docs/facebook-pixel/ (last visited January 15, 2025).
[52] *Id.*
[53] *Id.*
[54] *Meta Business Help Center: About Meta Pixel*, FACEBOOK, https://www.facebook.com/business/help/742478679120153?id=1205376682832142 (last visited January 15, 2025).
[55] *See generally id.*
[56] *Meta Business Help Center: Specifications for Meta Pixel standard events*, FACEBOOK, https://www.facebook.com/business/help/402791146561655?id=1205376682832142 (last visited January 15, 2025).
[57] The presence of Pixel events, such as the Microdata and PageView events, can be confirmed by using the publicly available and free Meta Pixel Helper tool. *See Meta Business Help Center: About the Meta Pixel Helper*, FACEBOOK, https://www.facebook.com/business/help/198406697184603?id=1205376682832142 (last visited January 15, 2025).

93.     Defendant shares non-anonymized PII with Facebook. Defendant's disclosures include unique identifiers (the "FID") that correspond to specific Facebook users. The recipient finds the PII and web watching history packaged together in a single data transmission which is easily readable by an ordinary person once the PII is packaged and delivered by the Website's Pixel.

94.     Defendant monetizes the Website's Subscribers by gathering Subscribers' marketing data and PII and disclosing that valuable information to Facebook. Defendant does so in a format which allows it to make a direct connection between the identity of a Subscriber and that Subscriber's PII, without the consent of its Subscribers and to the detriment of Plaintiffs' and Class Members' legally protected privacy rights.

95.     These factual allegations are corroborated by publicly available evidence. For instance, a Subscriber visits the Website, clicks on a video, such as "Meet the Beard that Killed its Owner," and subsequently views the video.

96.     The triggered Pixel Event sends sensitive data to Facebook within the parameters of the Request URL, the Request Header, or as a Payload within the request. The PageView event implemented by Defendant sends Subscribers' PII through the Request URL parameters[58] and HTTP Headers.[59]

---

[58] URL parameters are values that are added to a URL to cause a web server to provide additional or different services. *What is a URL?,* MOZILLA, https://developer.mozilla.org/en-US/docs/Learn/Common_questions/What_is_a_URL (last visited January 15, 2025).

[59] An "HTTP Header" is a field of an HTTP Request or response that passes additional context and metadata about the request or response. *HTTP header*, MOZILLA, https://developer.mozilla.org/en-US/docs/Glossary/HTTP_header (last visited January 15, 2025). Specifically, Request Headers are a subset of HTTP Headers that are used to provide information about a request's context, so that a server can customize its response to the request or supply authentication credentials to the server or otherwise provide more information about the client sending the request. *Id.*

97.    Defendant shares with Facebook the specific videos requested by Subscribers through Request URL parameters. This is portrayed in *Figures 2* and *3*, below.



*Figure 2 – Sample video on the Website*



*Figure 3 – PageView event transmitting video title and PII*

98.     Defendant also transmits Subscribers' PII to Facebook in the form of an unencrypted and unique FID contained in the c_user cookie included in the HTTP Request Header, as depicted above in *Figure 3*.

99.     An FID is PII. It contains a series of numbers used to identify a specific profile, as depicted below:

*Figure 4 - Sample c_user ID number of test account created to investigate the Pixel, captured by a Pixel event from a previous investigation*

100.    A FID can be used by anyone to easily identify a Facebook user by simply appending the FID to www.facebook.com (e.g., www.facebook.com/[FID_here]).

101.    Using the FID from *Figure 4*, appending it to the Facebook URL in a standard internet browser (here, www.facebook.com/100091959850832) will redirect the webpage straight to the Facebook profile associated with the FID, as depicted below:



*Figure 5 - Appending FID of a user to "facebook.com/" results in the user being redirected to the user's profile*

102.    Facebook, at a minimum, uses c_user cookies to link FIDs and corresponding Facebook profiles.

103.    Importantly, some Facebook profile information – name, gender, profile photo, cover photo, username, user ID (account number), age range, language and country – are "always

public."[60] No privacy setting on a Facebook account would allow Plaintiffs, or any users, to hide this basic information.

104.    By compelling a Subscriber's browser to disclose the c_user cookie alongside event data for video watching, Defendant knowingly disclosed information sufficiently permitting an ordinary person to identify what video a specific individual has streamed.

105.    Defendant also uploaded customer lists to Meta that contained Subscribers' email addresses and purchase information, including what videos they streamed or what subscription they purchased. Defendant uploaded these lists to Meta so that Meta can match Subscribers to their Facebook profiles.

106.    Meta admits that "[advertisers] provide us with information about [their] existing customers and we match this information with Facebook profiles."[61] The customer lists must contain "'identifier[s]' (such as email, phone number, address)"[62] so that Meta can match the lists to "Facebook profiles" and "[advertisers] can advertise to [their] customers on Facebook, Instagram and Audience Network."[63]

107.    Defendant also combined these customer lists with offline event data to effectively target PII Users. When advertisers create an ad campaign, Meta will "match the offline data [advertisers] upload to the event set so that [advertisers] can see how much [their] ads resulted in offline activity."[64] Meta also recommends that advertisers, like Defendant, provide an accurate timestamp for each event, down to "the minute or second."

108.    Defendant uploaded customer lists and offline events so it can match a Users' video stream searches, requests and subscriptions, with their corresponding Facebook profile.

---

[60]    *Control who can see what you share on Facebook*, FACEBOOK, https://www.facebook.com/help/1297502253597210 (last visited January 15, 2025).
[61]    *Create a Customer Audience List*, FACEBOOK, https://www.facebook.com/business/help/170456843145568?id=24690979533764 (last visited January 15, 2025).
[62] *Id.*
[63]    *Customer List Custom Audiences*, FACEBOOK, https://www.facebook.com/business/help/341425252616329?id=24690979533764 (last visited January 15, 2025).
[64]    *Upload Offline Event Data*, FACEBOOK, https://www.facebook.com/business/help/155437961572700?id=56590011044754 (last visited January 15, 2025).

**2. *Atlas Obscura Implemented the Pixel to Share Users' Search Terms***

109.    In addition to capturing and sharing Subscribers' PII (in violation of the VPPA) and irrespective of how the Subscriber reached the web watching page, the Pixel also intercepted and shared search terms entered by Plaintiffs.

110.    For example, a search for "Meet the Beard" on the Website and the resulting Pixel transmission are depicted in *Figures 6* and 7 below.



*Figure 6 - Sample search on the Website using search terms "Meet the Beard"*



*Figure 7 - Pixel transmission containing sample search terms "Meet the Beard"*

111.    Such search terms, while independently confidential, may also include the capturing and sharing of searches associated with Subscribers' video watching history, resulting in violation of the VPPA.

112.    Plaintiffs were unaware of the interception of their confidential communications with the Website.

113.    Plaintiffs reasonably believed that communications to the Website were made in confidence.

114.    With no notice or warning as to who was intercepting and decoding the contents of their communications, Plaintiffs were not provided notice of or given an opportunity to provide consent to the Tracking Entities' interceptions of Plaintiffs' search terms.

## B.  The Google Tracking Tools

115.    Google has an array of advertising products, each serving a specific function in advertising portfolios.

### 1. *Google Ads*

116.    One product, Google Ads (formerly AdWords), is an advertising platform developed by Google, that allows advertisers to place bids to display advertisements, service offerings, product listings, or videos to web users.[65]

117.    The process advertisers using Google Ads to display ads within text-based search results is as follows: (i) advertisers create text-based ads with a title, description, and a link to the website to place within the Google search results; (ii) advertisers then choose keywords, usually related to their business or target audience, intended to trigger their ads to appear within the user's search results;[66] (iii) Google then allows advertisers to bid on those various keywords;[67] (iv) the advertiser with the highest bid wins the auction, and the ad is displayed on the search results page; and (v) the winning ad appears above or below the organic search results and is marked as an ad.

118.    Google AdSense, works in conjunction with the Google Ads bidding system, allowing website owners to show Google Ads on websites and earn a revenue share from each ad each time it is viewed or clicked on their own sites.[68] The search terms that various entities bid for through Google Ads are then used by websites owners using Google AdSense to allow website owners to share in the profit Google generates from the advertising.

119.    AdSense for content or AdSense for search are methods by which AdSense functions.[69] In either case, AdSense allows the website host to match ads to the website users based on the website's content and visitors.

120.    Google Ads intercepted Plaintiffs' search terms, as depicted below.

---

[65]*Achieve all your goals in one place*, GOOGLE ADS, https://ads.google.com/home/goals/ (last visited January 15, 2025).

[66] *Reach the right people with Search Ads*, GOOGLE ADS, https://ads.google.com/home/campaigns/search-ads/ (last visited January 15, 2025).

[67] *Id*.

[68] *Home*, GOOGLE ADSENSE, https://www.google.com/adsense/start/how-it-works/ (last visited January 15, 2025).

[69] *AdSense revenue share*, GOOGLE ADSENSE REVENUE, https://support.google.com/adsense/answer/180195?hl=en (last visited January 15, 2025).



*Figure 8 – Test search made on the Website resulted in sharing Search Terms "Meet the Beard" with Google Page Ads*

121.    Google benefits when website owners utilize Google Ads and Google AdSense in connection with their websites.

122.    Through Google AdSense, Google derives benefits from the ability to aggregate the search data it collects from website users to improve its own services and provide more relevant search results. By understanding patterns and trends in user behavior, Google better understands and gains unencumbered insight into what users are searching for and what they are interested in, which helps Google improve its own services, develop new products and overall increase revenues.

123.    Google's collection and analysis of search results also allows it to improve its machine learning algorithms.[70] Google uses data on how users interact with search results to train its algorithms to provide more accurate and relevant search results.[71] For example, if a user clicks on a particular search result and spends more time on that page, Google learns that this page is likely more relevant to that search query.  By gathering this vast array of data on all users, Google

---

[70] Elle Poole Sidell, *What Does Google Do With Your Data?*, AVAST (Dec. 18, 2020), https://www.avast.com/c-how-google-uses-your-data (last visited January 15, 2025).
[71] *Id.*

can build an advertising portfolio for each user which includes their gender, age, job industry, and interests.[72]

124.    Google profits in several ways from the Website's use of the Google search engine: (i) advertisers bid and pay Google for the keywords that will result in their ads showing in search results; (ii) through AdSense search, every time a user clicks or views an ad (depending on their chosen method), the advertiser will pay Google for that click or view; (iii) and Google's ability to aggregate user search data allows them to further tailor their own products to advertisers and users alike by training its algorithms with vast amounts of search data.

### 2.    Google DoubleClick

125.    DoubleClick for Publishers ("DoubleClick"), now also known as Google Ad Manager, allows website owners to monetize their websites by selling ad space within their websites.[73] DoubleClick connects website owners with advertisers who want to buy ad space within the owners' website, and allows advertisers to track the performance of their ads across websites.[74] DoubleClick acts as a liaison between a website owner's ad inventory, relevant ad networks, and advertisers that are looking to purchase ad space on a website.[75]

126.    DoubleClick works in a similar way to Google Ads in that it allows companies to buy impressions through the DoubleClick Ad Exchange.[76] DoubleClick is typically used for large-scale advertising as the DoubleClick Ad Exchange connects and aggregates website owners and advertisers of over 100 Ad Exchanges.[77]

---

[72] *Id.*
[73] Shubham Grover, *DFP Glossary: An Easier Explanation for All the Jardon*, ADPUSHUP (Dec. 10, 2022), https://www.adpushup.com/blog/dfp-glossary-easier-explanation-jargon/ (last visited January 15, 2025).
[74] *Id.*
[75] Brock Munro, *DoubleClick for Publishers: Everything You Need to Know*, PUBLIFT (Dec. 1, 2024), https://www.publift.com/blog/what-is-googles-dfp-first-look (last visited January 15, 2025).
[76] Tina Arnoldi, *Programmatic advertising overview: DoubleClick by Google*, SUPERMETRICS (Dec. 8, 2017), https://supermetrics.com/blog/double-click-overview (last visited January 15, 2025).
[77] *Id.*

127. The process for DoubleClick works as follows: (i) a website operator signs up for the platform by creating a Google Ad Manager account;[78] (ii) a third-party advertiser then creates an ad campaign using Google AdWords, which includes ad creatives, targeting options, and bid strategies; (iii) the advertiser then submits the ad to DoubleClick where it is reviewed and approved;[79] (iv) once approved, the website owner can put the ad on the DoubleClick Ad Exchange to find a buyer for the ad space.[80]

128. Once implemented by the website operator, such as Defendant, when Users or Subscribers visit a webpage with a DoubleClick Ad, the user experiences the web page on their browser as an integrated collage of text and images. A DoubleClick Ad, as displayed on the PCWorld Website, is depicted below.



*Figure 9 – DoubleClick Ad Banner on Website*

---

129.    However, the content delivered to each webpage is, in reality, aggregated from multiple independent sources. The website owner leaves part of its webpage blank where the third-party advertisements will appear. When a website receives a request from a user visiting a particular webpage, the server for that webpage will respond to the browser, instructing the browser to send a request to the third-party company charged with serving the advertisements for that particular webpage. The third-party's advertising server responds to the user's request by sending the advertisement to the user's browser, which then displays it on the user's device. This entire process occurs within milliseconds and the third-party content appears to arrive simultaneously with the first-party content so that the user does not discern any separate GET requests from the third-parties.

130.    Additionally, DoubleClick tracks the performance of ads and provides data such as impressions, clicks, and conversions to the advertiser. That information is then used to further optimize advertising campaigns. The DoubleClick's ad server uses targeting and bidding algorithms to determine which ad to display, based on factors such as the user's location, browsing history, and interest.[81]

131.    Defendant sends this information, including Users' search terms, to Google via the URL doubleclick.net as depicted below.

---

[81] Joanna Geary, *DoubleClick (Google): What is it and what does it do?*, THE GUARDIAN (Apr. 23, 2012 12:08 PM), https://www.theguardian.com/technology/2012/apr/23/doubleclick-tracking-trackers-cookies-web-monitoring (last visited January 15, 2025).



*Figure 12 – Using the Website's Search Bar results in DoubleClick intercepting and obtaining search terms*

132.    The bidding system is similar to the Google Ads system. The benefits provided to Google from DoubleClick Ads are also similar to those provided by Google's search ads. First, Google Ad Manager has various fee structures that can be utilized including a percentage of spend plus a flat monthly fee; a flat monthly fee or percentage of spend, whichever is higher or a flat fee percentage based on the amount you spend every month.[82] Regardless of the structure, Google earns revenue from allowing website owners to utilize its code to display ads purchased from the DoubleClick Ad Exchange.

---

[82] Joe Balestrino, *How Much Does Google Ads Management Cost?*, Joe Balestrino (Feb. 17, 2023), https://www.joebalestrino.com/how-much-does-google-ads-management-cost (last visited January 15, 2025).

133.    Google also aggregates data on what users are clicking on the website owner's sites to further improve their algorithms, develop their own products, and further drive revenue.[83]

134.    The IDG Websites, including the PCWorld Website, allow Google to integrate DoubleClick advertisements into their Website to further monetize their Users. The website owner, here Defendant, receives money for selling the ad space on their Website, thus directly benefiting from the DoubleClick implementation.

135.    As explained above, AdSense ads are based on the Google Ads bidding process. In connection with searches using AdSense, publishers, such as Defendant, receive 51 percent of the revenue recognized by Google.[84]

### 3.  Google Analytics

136.    Like the Facebook Pixel, Google Analytics ("GA") collects data about user interactions with a website, including: link clicks, button clicks, form submissions, conversions, shopping cart abandonment, adding items to carts, removing items from carts, file downloads, scrolling behavior, video views, call to action performance, table of contents clicks, and other customizable events.[85]

137.    The data collected through GA is sent back to Google, which associates the activity with the website it was collected from.[86] Notably, Google notifies web developers that developers

---

[83] Elle Poole Sidell, *What Does Google Do With Your Data?*, AVAST (Dec. 18, 2020), https://www.avast.com/c-how-google-uses-your-data (last visited January 15, 2025).
[84] *Id.*
[85] Zach Paruch, *What Is Google Tag Manager & How Does It Work?*, SEMRUSH: BLOG (Jan. 4, 2024) https://www.semrush.com/blog/beginners-guide-to-google-tag-manager/ (last visited January 15, 2025).
[86] *Tag    Manager    Help:    About    the    Google    Tag*, GOOGLE, https://support.google.com/tagmanager/answer/11994839?hl=en (last visited January 15, 2025).

should provide "users with clear and comprehensive information about the data . . . collect[ed] on [their] websites" and to obtain "consent for that collection where legally required."[87]

138.    In short, the use of GA represents specific data collection practices and settings and pre-determined destinations for that data. Google itself is aware of the potential legal violations its data collection tools are capable of and puts the onus of warning users onto the website developers, such as Defendant.

139.    Here, Defendant added GA to its Website, which resulted in the interception by and redirection of Plaintiffs' search terms to Google, as depicted from the example taken directly from the Website below.



*Figure 9 – Test search made on the Website resulted in sharing search terms "Meet the Beard" with Google Analytics*

140.    After arriving at those common destinations, the Google products provide analysis and feedback which help the Defendant to monetize the collected information through targeted advertising.

---

[87] *Id.*

## V.       The Website Lacked Informed, Written Consent Pursuant to the VPPA

141.    The VPPA explicitly requires "informed, written consent of the consumer," including through an electronic means using the Internet, that is "distinct and separate from any form setting forth other legal or financial obligations of the consumer []" and "at the election of the consumer[.]" 18 U.S.C. § 2710(b)(2)(B).

142.    The Website does not seek or obtain permission from Subscribers, including Plaintiffs and the Class, to share the Subscribers' PII or web watching history with third parties, including Facebook.

143.    The sign-up process for subscriptions to the Website's newsletters or digital magazines do not seek or obtain informed, written consent.

144.    To the extent information about any of the Website's data sharing can be located, the language is not (i) presented to Subscribers of the site in a transparent manner, or where it must be viewed; (ii) made available as part of the sign-up process; (iii) offered to Subscribers as a checkbox or e-signature field, or as any form of consent; and (iv) presented in terms that sufficiently warn Subscribers that their information, protected by the VPPA, will be shared with Facebook.[88]

## VI.      Plaintiffs Did Not Consent to Defendant's Sharing of Plaintiffs' Search Terms

145.    Plaintiffs were unaware of the Pixel's, and other Tracking Tools', interception of their confidential communications with the Website. The absent Class and Subclass Members were equally unaware of the Tracking Tools intercepting their confidential communications with the Website.

146.    Plaintiffs reasonably believed that communications to the Website were made in confidence. Absent Class and Subclass Members held the same expectation in connection with their own communications between themselves and the Website.

---

[88] *Privacy Policy*, ATLAS OBSCURA, https://www.atlasobscura.com/privacy (last visited January 15, 2025).

147.    With no notice or warning as to who was intercepting and decoding the contents of their communications, Plaintiffs were not provided notice of or given an opportunity to provide consent to the Tracking Tools' interceptions of Plaintiffs' search terms.

148.    Meta and Google, by way of example, guide and caution website operators of the dangers of using their tracking tools without first providing notice of and then obtaining valid consent for invasively collecting consumers' protected data and either making that data available to third-parties or allowing third parties to intercept consumers' protected information.  Defendant agreed to these terms, in order to utilize and employ the Tracking Tools.

149.    In contravention to Meta's and Google's terms and guidance, Plaintiffs were not given notice of the use of the Tracking Tools on the Website.

150.    As a result, Plaintiffs did not and could not provide consent to the collection and sharing of their data when visiting the Website, running searches on the Website, and requesting videos from the Website.

## VII.    Plaintiffs Have a Privacy Right in their Search Terms

151.    Communications shared between consumers and companies appear to be private but, in reality, the contents of those messages are regularly shared.

152.    Here, Defendant shares consumers' information, including search terms, with the Tracking Entities.

153.    Search terms are inherently private. This is particularly true when the searches are communicated in confidence or presumed to be private. All search terms are personal in nature, but there is an obviously heightened want for the searches to be kept confidential when the search terms themselves contain private information.

154.    As described in Section I, descriptions and summaries of requested pre-recorded audio-visual materials are private information worthy of federal protection.

155.    Users search for video materials on the Website using search terms. The search terms, when associated with descriptions or summaries of the pre-recorded videos, pertain to more than Users' basic privacy.

156.    Courts have recognized that users have a reasonable expectation of privacy in URLs that disclose unique search terms or the particular document within a website that a person views.[89]

157.    As demonstrated in Section IV, Users' private information is shared through detailed URLs with various third parties, including the Tracking Entities.

## INJUNCTIVE RELIEF OF DEFENDANT'S ONGOING VPPA AND WIRETAP VIOLATIONS

158.    An actual and immediate controversy has arisen and now exists between Plaintiffs and the putative Classes they seek to represent, and Defendant, which parties have genuine and opposing interest in and which their interests are direct and substantial. Defendant has violated, and continues to violate, Plaintiffs' rights to protection of their PII under the VPPA and the Wiretap Act.

159.    Plaintiffs demonstrated that they are likely to succeed on the merits of their claims and thereby are entitled to declaratory and injunctive relief.

160.    Plaintiffs have no adequate remedy at law to stop the continuing violations of the VPPA and Wiretap Act by Defendant. Unless enjoined by the Court, Defendant will continue to infringe on the privacy rights of Plaintiffs and the absent Class Members and will continue to cause, or allow to be caused, irreparable harm to Plaintiffs. Injunctive relief is in the public interest to protect the PII of Plaintiffs, and other consumers that would be irreparably harmed through continued disclosure of their PII.

---

[89] *Heerde v. Learfield Commc'ns, LLC*, No. 2:23-CV-04493-FLA (MAAX), 2024 WL 3573874 (C.D. Cal. July 19, 2024) (citing *Brown v. Google LLC*, 685 F.Supp.3d 909, 941 (N.D. Cal. 2023)).

161.    Defendant disregards its obligation under the VPPA and the Wiretap Act by installing the Tracking Tools, including the Pixel, onto the Website and facilitating the sharing of Users' PII with third parties for any ordinary person to access and use.

162.    Despite brazenly violating the VPPA and the Wiretap Act, Users were provided with no notice of the employment of the Tracking Tools and no indication of how or how much of their information was shared with third parties. Worse, in further violation of the VPPA and the Wiretap Act, Defendant did not seek or obtain any form of consent from Users for the use of the Tracking Tools to share information improperly obtained from the Website.

163.    This threat of injury to Plaintiffs from the continuous violations requires temporary, preliminary, and permanent injunctive relief to ensure their PII is protected from future disclosure without adequate notice and consent.

## TOLLING

164.    The statutes of limitations applicable to Plaintiffs' and the Classes' claims were tolled by Defendant's conduct and Plaintiffs' and Class and Subclass Members' delayed discovery of their claims.

165.    As alleged above, Plaintiffs and members of the Classes did not know and could not have known when they used the Website that Defendant was disclosing their information and communications to third parties. Plaintiffs and members of the Classes could not have discovered Defendant's unlawful conduct with reasonable diligence.

166.    Defendant secretly incorporated the Tracking Tools into the Website, providing no indication to consumers that their communications would be disclosed to these third parties.

167.    Defendant had exclusive and superior knowledge that the Tracking Entities' Tracking Tools incorporated on its Website would disclose consumers' protected and private information and confidential communications, yet failed to disclose that by interacting with the Website, Plaintiffs' and Class and Subclass Members' PII would be disclosed to third parties.

168.    Plaintiffs and members of the Classes could not with due diligence have discovered the full scope of Defendant's conduct because the incorporation of the Tracking Entities' Tracking Tools is highly technical and there were no disclosures or other indication that would inform a reasonable consumer or Website user that Defendant was disclosing and allowing the interception of such information to these third parties.

169.    The earliest Plaintiffs and Class and Subclass Members could have known about Defendant's conduct was in connection with their investigation and the work done on their behalf in preparation of filing of this Complaint.

## CLASS ACTION ALLEGATIONS

170.    Plaintiffs brings this action individually and on behalf of the following Classes:

All Users of the Website who had their Sensitive Information improperly intercepted by the Website and disclosed to third parties through the use of the Tracking Tools (the                                                    "Class").

All Users of the Website who reside in California who had their Sensitive Information improperly intercepted by the Website and disclosed to third parties through the use of the Tracking Tools (the "California Subclass").

171.    Specifically excluded from the Classes are Defendant, its officers, directors, agents, trustees, parents, children, corporations, trusts, representatives, employees, principals, servants, partners, joint venturers, or entities controlled by Defendant, and its heirs, successors, assigns, or other persons or entities related to or affiliated with Defendant and/or its officers and/or directors, the judge assigned to this action, and any member of the judge's immediate family.

172.    Plaintiffs reserve the right to amend the Class definitions above if further investigation and/or discovery reveals that the Classes should be expanded, narrowed, divided into subclasses, or otherwise modified in any way.

173.    This action may be certified as a class action under Federal Rule of Civil Procedure 23 because it satisfies the numerosity, commonality, typicality, adequacy, and superiority requirements therein.

174.    <u>Numerosity (Rule 23(a)(1))</u>: At this time, Plaintiffs do not know the exact number of members of the aforementioned Classes. However, given the popularity of Defendant's Website, the number of persons within the Classes is believed to be so numerous that joinder of all members is impractical.

175.    <u>Typicality of Claims (Rule 23(a)(3))</u>: Plaintiffs' claims are typical of those of the Classes because Plaintiffs, like all members of the Classes, subscribed to, and used, the Website to stream videos, and had their Sensitive Information collected and disclosed by Defendant.

176.    <u>Adequacy of Representation (Rule 23(a)(4))</u>: Plaintiffs will fairly and adequately represent and protect the interests of the Classes. Plaintiffs have no interests antagonistic to, nor in conflict with, the Classes. Plaintiffs have retained competent counsel who are experienced in consumer and commercial class action litigation and who will prosecute this action vigorously.

177.    <u>Superiority (Rule 23(b)(3))</u>: A class action is superior to other available methods for the fair and efficient adjudication of this controversy.  Because the monetary damages suffered by individual Class and Subclass Members is relatively small, the expense and burden of individual litigation make it impossible for individual Class and Subclass Members to seek redress for the wrongful conduct asserted herein. If Class treatment of these claims is not available, Defendant will likely continue its wrongful conduct, will unjustly retain improperly obtained revenues, or will otherwise escape liability for its wrongdoing as asserted herein.

178.    <u>Commonality and Predominance (Rule 23(a)(2), 23(b)(3))</u>: There is a well-defined community of interest in the questions of law and fact involved in this case. Questions of law and fact common to the members of the Classes that predominate over questions that may affect individual members of the Classes include:

a.    Whether Defendant collected Plaintiffs and the Classes' Sensitive Information;

b.    Whether Defendant unlawfully disclosed and continue to disclose the PII of Subscribers of the Website in violation of the VPPA;

c.    Whether Defendant's disclosures were committed knowingly; and

d.      Whether Defendant disclosed Plaintiffs' and the Classes' Sensitive Information without consent.

179.    Information concerning the Website's data sharing practices and subscription members is available from Defendant's or third-party records.

180.    Plaintiffs know of no difficulty which will be encountered in the management of this litigation which would preclude its maintenance as a class action.

181.    The prosecution of separate actions by individual members of the Classes would run the risk of inconsistent or varying adjudications and establish incompatible standards of conduct for Defendant. Prosecution as a class action will eliminate the possibility of repetitious and inefficient litigation.

182.    Defendant has acted or refused to act on grounds generally applicable to the Classes, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the Classes as a whole.

183.    Given that Defendant's conduct is ongoing, monetary damages are insufficient and there is no complete and adequate remedy at law.

## CAUSES OF ACTION

### COUNT I
### VIOLATION OF THE VIDEO PRIVACY PROTECTION ACT
### 18 U.S.C. § 2710, *et seq.*
### (On behalf of Plaintiffs and the Class)

184.    Plaintiffs incorporate by reference and re-alleges each and every allegation set forth above in all preceding paragraphs of this Complaint as though fully set forth herein.

185.    Plaintiffs bring this count on behalf of themselves and all members of the Class.

186.    The VPPA provides that "a video tape service provider who knowingly discloses, to any person, personally identifiable information concerning any consumer shall be liable to the aggrieved person for the relief provided in subsection (d)." 18 U.S.C. § 2710(b)(1).

187.    Defendant violated this statute by knowingly disclosing Plaintiffs and other Class Members' personally identifiable information to Facebook.

188.    Defendant, through the Website, engaged in the business of delivering video content to Subscribers, including Plaintiffs and the other Class Members, and other users.  The Website delivers videos to subscribers, including Plaintiffs and the other Class Members, by making those materials electronically available to Plaintiffs and the other Class Members on the Website.

189.    "Personally Identifiable Information" is defined to include "information which identifies a person as having requested or obtained specific video materials or services from a video tape service provider." 18 U.S.C. § 2710(a)(3).

190.    A "video tape service provider" is "any person, engaged in the business, in or affecting interstate commerce, of rental, sale, or delivery of pre-recorded video cassette tapes or similar audio-visual materials." 18 U.S.C. § 2710(a)(4).

191.    Defendant is a "video tape service provider" because it curates, hosts, provides access to, and causes the delivery of thousands of videos on the Website, thereby "engag[ing] in the business, in or affecting interstate or foreign commerce, of rental, sale, or delivery of pre-recorded video cassette tapes or similar audio-visual materials." 18 U.S.C. § 2710(a)(4).

192.    Defendant solicits individuals to subscribe to its Newsletters to unlock access to content published or produced by Defendant.

193.    Plaintiffs and members of the Class are "consumers" because they watched videos on the Website, signed up for Newsletters and/or paid money for Digital Magazines subscription directly. 18 U.S.C. § 2710(a)(1).

194.    Plaintiffs and the Class Members searched for and/or streamed videos using the Website.

195.    Defendant disclosed Plaintiffs and the Class Members' PII to Facebook. Defendant utilized the Pixel which forced Plaintiffs' web browsers to transfer Plaintiffs identifying information, like their Facebook IDs, along with Plaintiffs' event data, like the titles of the videos they searched for or streamed.

196.    Defendant knowingly disclosed Plaintiffs PII, which is triggered automatically through Defendant's use of the Pixel. No additional steps on the part of the Defendant, Facebook, or any third-party are required. And, once the Pixel's routine exchange of information is complete, the FID that becomes available can be used by any individual to easily identify a Facebook user, by simply appending the FID to www.facebook.com (e.g., www.facebook.com/[FID_here]). That step, readily available through any internet browser, will direct the browser to the profile page, along with all the information contained in or associated with that profile page.

197.    The VPPA provides that a videotape service provider may disclose personally identifiable information concerning a consumer as long as that person has provided "informed written consent . . . in a form distinct and separate from any form setting forth other legal or financial obligations of the consumer." 18 U.S.C. § 2710(b)(2)(A)(i).

198.    Plaintiffs and Class Members did not provide Defendant with any form of consent—either written or otherwise—to disclose their PII to third parties. Defendant failed to obtain "informed, written consent" from Users – including Plaintiffs and Class Members – "in a form distinct and separate from any form setting forth other legal or financial obligations of the consumer" and "at the election of the consumer," either "given at the time the disclosure is sought" or "given in advance for a set period of time, not to exceed 2 years or until consent is withdrawn by the consumer, whichever is sooner." 18 U.S.C. § 2710(b)(2)(B)(i)-(ii).

199.    Defendant's use of Plaintiffs and Class Members' PII for marketing purposes was also prohibited. PII may be disclosed "for the exclusive use of marketing goods and services directly to the consumer" only where "the disclosures are solely of the names and addresses of consumers **and** . . . the disclosures do not identify the title, [or] description, . . . of any . . . audio visual material[.]" 18 U.S.C. § 2710(b)(2)(D); (b)(2)(D)(ii) (emphasis added). Here, Defendant did disclose Plaintiffs and Class Members' PII, including video search titles, for solely marketing purposes.

42

200.    Defendant's disclosure of Plaintiffs and Class Members' PII was not made in the "ordinary course of business" as the term is defined by the VPPA. In particular, Defendant's disclosures to Facebook were not necessary for "debt collection activities, order fulfillment, request processing, [or] transfer of ownership." 18 U.S.C. § 2710(a)(2).

201.    In addition, the VPPA creates an opt-out right for consumers in 18 U.S.C. § 2710(2)(B)(iii). It requires video tape service providers to also "provide[] an opportunity for the consumer to withdraw on a case-by-case basis or to withdraw from ongoing disclosures, at the consumer's election." Defendant failed to provide an opportunity to opt out as required by the VPPA.

202.    On behalf of themselves and the Class, Plaintiffs seek: (i) declaratory relief as to Defendant; (ii) injunctive and equitable relief as is necessary to protect the interests of Plaintiffs and the Class by requiring Defendant to comply with VPPA's requirements for protecting a consumer's PII; (iii) statutory damages of $2,500 for each violation of the VPPA pursuant to 18 U.S.C. § 2710(c) as to Defendant; and (iv) reasonable attorneys' fees and costs and other litigation expenses.

## COUNT II
## VIOLATION OF COMMON LAW INVASION OF PRIVACY
### Intrusion Upon Seclusion
### (On Behalf of Plaintiffs and the Class)

203.    Plaintiffs incorporate by reference and re-alleges each and every allegation set forth above in all preceding paragraphs of this Complaint as though fully set forth herein.

204.    Plaintiffs bring this claim individually and on behalf of the members of the proposed Class against Defendant.

205.    Plaintiffs and Class Members maintained a reasonable expectation of privacy in their communications with Defendant via its Website. Users' search terms, browsing history, geolocation data, and website activity have been recognized by society as sensitive information.[90]

---

[90] For example, Florida voted to pass the Florida Consumer Privacy Act of 2018 and voted to amend it in 2020 through Proposition 24, the Florida Privacy Rights Act (CPRA). The CPRA sets out that colling and using "personal

206.    Plaintiffs and Class Members' reasonable expectation of privacy is supported by the VPPA's recognition that PII is sensitive information that must be protected from unauthorized disclosure.

207.    Plaintiffs and Class Members maintained a reasonable expectation of privacy believing that Defendant would not share their Sensitive Information with third parties, as a VTSP, because Defendant was under a duty to not share such information with Meta unless Defendant had explicit authorization to do so.

208.    Plaintiffs and members of the Class have an interest in: (i) precluding the dissemination and/or misuse of their sensitive and confidential information; and (ii) being free to search for and consume audio video materials without observation, intrusion or interference, including, but not limited to, the right to visit and interact with internet website without being subjected to wiretaps without Plaintiffs and Class Members' knowledge or consent.

209.    As explained above, Defendant's actions constitute a serious invasion of privacy that was an egregious breach of social norms, such that the breach was highly offensive to a reasonable person because:

    i.   The invasion of privacy occurred in a highly sensitive setting – Users' communications with the Defendant;

    ii.   Defendant had no legitimate objective or motive in invading Plaintiffs and Class Members' privacy in such a manner;

    iii.   Defendant violated multiple laws by invading Plaintiffs and Class Members' privacy, including the VPPA and the Wiretap Act;

    iv.   Defendant deprived Plaintiffs and Class Members of the ability to control dissemination of their Sensitive Information; and

---

information," including real names, online identifiers, internet browsing and search history, location data, audio and visual information, etc., requires businesses to provide adequate notice of such practices. *See generally* Cal. Civ. Code §§1798.100, 1798.105, 1798.106, 1798.110, 1798.115, 1798.120, 1798.140(v).

     v.   Defendant's action is also unacceptable as a matter of public policy because it undermine the relationship between consumers and their video tape service providers.

210. Within the relevant time period, by implementing the Pixel on the Website, Defendant intentionally invaded Plaintiffs and Class Members' privacy rights, and procured the Tracking Entities to do so.

211. As a direct and proximate result of this infringement upon their privacy, Plaintiffs and Class Members sustained harm and experienced various damages. In light of this injury, Plaintiffs and Class Members are pursuing suitable remedies, such as compensatory damages, restitution, disgorgement, punitive damages, and any other relief that the Court deems appropriate and fair.

**COUNT III**
**VIOLATION OF THE FEDERAL WIRETAP ACT**
**18 U.S.C. § 2710, *et seq.***
**(On Behalf of Plaintiffs and the Class)**

212. Plaintiffs hereby incorporate by reference and re-allege herein the allegations contained in all preceding paragraphs of this Complaint as though fully set forth herein.

213. Plaintiffs bring this claim individually and on behalf of the members of the proposed Class against the Defendant.

214. Codified under 18 U.S.C. §§ 2510 *et seq.*, the Federal Wiretap Act prohibits the interception of any wire, oral, or electronic communications without the consent of at least one authorized party to the communication.

215. The Wiretap Act confers a civil private right of action to "any person whose wire, oral, or electronic communication is intercepted, disclosed, or intentionally used in violation of this chapter." 18 U.S.C. § 2520(a).

216. The Wiretap Act defines "intercept" as "the aural or other acquisition of the contents of any wire, electronic, or oral communication through the use of any electronic, mechanical, or other device." 18 U.S.C. § 2510(4).

45

217. The Wiretap Act defines "contents" as "includ[ing] any information concerning the substance, purport, or meaning of that communication." 18 U.S.C. § 2510(8).

218. The Wiretap Act defines "person" as "any employee, or agent of the United States or any State or political subdivision thereof, and any individual, partnership, association, joint stock company, trust, or corporation." 18 U.S.C. § 2510(6).

219. The Wiretap Act defines "electronic communication" as "any transfer of signs, signals, writing, images, sounds, data, or intelligence of any nature transmitted in whole or in part by a wire, radio, electromagnetic, photoelectronic or photo optical system that affects interstate or foreign commerce . . . ." 18 U.S.C. § 2510(12).

220. Defendant is a person for the purposes of the Wiretap Act.

221. The Pixel and other tracking tools constitute a "device or apparatus which can be used to intercept a wire, oral, or electronic communication." 18 U.S.C. § 2510(5).

222. The confidential communications Plaintiffs and members of the Class had with the Website, in the form of their Sensitive Information, were intercepted by the Tracking Entities and such communications were "electronic communications" under 18 U.S.C. § 2510(12).

223. Plaintiffs and members of the Class had a reasonable expectation of privacy in their electronic communications with the Website in the form of their search terms submitted to the Website and browsing information. Even if Plaintiffs and members of the Class would not have had reasonable expectation of privacy in the electronic communications normally, Plaintiffs and Class Members' electronic communications with the Website included descriptions and summaries of the videos they watched, searched for, requested, or subscribed to unlock access to, along with their identifying information, giving rise to a reasonable expectation of privacy pursuant to the VPPA.

224. Plaintiffs and members of the Class reasonably expected that third parties were not intercepting, recording, or disclosing their electronic communications with the Website.

225. Within the relevant time period, the electronic communications between Plaintiffs and members of the Class and the Website was intercepted by the Pixel the instant they were sent

to the Website, without consent, and for the unlawful and wrongful purpose of monetizing their private information, which includes the purpose of using such private information to develop advertising and marketing strategies.

226.    Interception of Plaintiffs and Class Members' confidential communications with the Website occur whenever a user uses the search bar within the Website, and when navigating various webpages of the Website, including those containing videos.

227.    At all times relevant to this Complaint, Defendant's conduct was knowing, willful, and intentional, as Defendant is a sophisticated party with full knowledge regarding the functionality of the Pixel and other Tracking Tools, including that allowing the Tracking Tools to be implemented on the Website would cause the private communications of its Users to be shared with third parties.

228.    Plaintiffs and members of the Class were never asked for their consent to expose their confidential electronic communications with the Website to third parties. Indeed, such consent could not have been given as the Tracking Entities and Defendant never sought any form of consent from Plaintiffs or members of the Class to intercept, record, and disclose their private communications with the Website.

229.    As detailed above, the Tracking Entities' unauthorized interception, disclosure and use of Plaintiffs and the Class Members' confidential communications was only possible through the Defendant's knowing, willful, or intentional placement of the tracking tools on the Website. 18 U.S. Code § 2511(1)(a).

230.    Plaintiffs and members of the Class have been damaged due to the unauthorized interception, disclosure, and use of their confidential communications in violation of 18 U.S.C. § 2520. As such, Plaintiffs and members of the Class are entitled to: (1) damages, in an amount to be determined at trial, assessed as the greater of (a) the sum of the actual damages suffered by Plaintiff and members of the Class and any profits made by Defendant as a result of the violation, or (b) statutory damages of whichever is the greater of $100 per day per violation or $10,000; (2)

appropriate equitable or declaratory relief; and (3) reasonable attorneys' fees and other litigation expenses.

**COUNT V**
**VIOLATION OF THE CALIFORNIA'S INVASION OF PRIVACY ACT**
**Cal. Penal Code § 631**
**(On Behalf of Plaintiff Barajas and California Subclass)**

231.    Plaintiff Barajas hereby incorporates by reference and re-alleges herein the allegations contained in all preceding paragraphs of this Complaint.

232.    Plaintiff Barajas brings this count on behalf of himself and all members of the California Subclass.

233.    CIPA provides that a person is liable to another where, "by means of any machine, instrument, contrivance, or in any other manner," committed any of the following: (i) intentionally tapped, or made any unauthorized connection, whether physically, electrically, acoustically, inductively or otherwise, with any telegraph or telephone wire, line, cable, or instrument, including the wire, cable, or instrument of any internal telephonic communication system; or (ii) willfully and without consent of all parties to the communication, or in any unauthorized manner, reads or attempts to read or learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line or cable or is being sent from or received at any place within this state; or (iii) uses, or attempts to use, in any manner, or for any purpose, or to communicate in any way, any information so obtained; or (iv) aids, agrees with, employs, or conspires with any person or persons to unlawfully do, or permit or cause to be done any of the acts or things mentioned above in this section.  Cal. Penal Code Section 631(a).

234.    The Ninth Circuit has confirmed that one of the purposes of wiretapping statutes is to "prevent the acquisition of the contents of a message by an unauthorized third-party . . . ." In re Facebook Internet Tracking Litig., 956 F.3d 589, 608 (9th Cir. 2020).  In dealing specifically with CIPA, the California Supreme court has similarly concluded that the objective of CIPA is to protect a person's communications "from a situation where the other person on the other end of

the line permits an outsider" to monitor the communication.  Ribas v. Clark, 38 Cal. 3d 355, 363 (1985); see Smith v. LoanMe, 11 Cal. 5th 183, 200 (2021).

235.    The Website, including the Tracking Tools placed upon it, is a "machine, instrument, contrivance, or … other manner" used to engage in the prohibited conduct at issue here.

236.    Similarly, user's internet browsers, when instructed to transmit data by the Defendant's Tracking Tools, is a "machine, instrument, contrivance, or … other manner" used to engage in the prohibited conduct at issue here.

237.    Within the relevant time period, Plaintiff Barajas and members of the California Subclass:

> a.    used the search function to find video on the Website;
>
> b.    navigated the Website to find webpages containing videos; and/or
>
> c.    used the Website to purchase Membership subscription and/or to watch audio-visual content.

238.    Within the relevant time period, the Tracking Entities, without the consent of all parties to the communication, or in any unauthorized manner, willfully read, or attempted to read, or learn the contents or meaning of electronic communications of Plaintiff Barajas and the putative California Subclass Members, contemporaneous with the communications transit through or passing over any wire, line or cable or with the communications sending from or being received at any place within California.

239.    The information collected by the Tracking Entities was not for the sole benefit of the Defendant.

240.    Within the relevant time period, Defendant also aided, agreed with, conspired with, and employed the Tracking Entities to accomplish the wrongful conduct at issue here.

241.    Plaintiff Barajas and members of the California Subclass did not authorize or consent to the tracking, interception, and collection of any of their electronic communications.

242.    The violation of section 631 constitutes an invasion of privacy sufficient to confer Article III standing.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs, individually and on behalf of all others similarly situated, seeks judgment against Defendant, as follows:

(a)    For an order determining that this action is properly brought as a class action and certifying Plaintiffs as the representative of the Class and their counsel as Class Counsel;

(b)    For an order declaring that Defendant's conduct violates the statutes referenced herein;

(c)    For an order finding in favor of Plaintiffs and the Class on all counts asserted herein;

(d)    Entry of an order for injunctive and declaratory relief as described herein, including, but not limited to, requiring Defendant to immediately (i) remove the Tracking Tools from the Website or (ii) add, and obtain, the appropriate consent from Users;

(e)    For damages in amounts to be determined by the Court and/or jury;

(f)    An award of statutory damages or penalties to the extent available;

(g)    For Defendant to pay $2,500.00 to Plaintiffs and each Class Member, as provided by the VPPA, 18 U.S.C. § 2710(c)(2)(A);

(h)    For pre-judgment interest on all amounts awarded;

(i)    For an order of restitution and all other forms of monetary relief;

(j)    An award of all reasonable attorneys' fees and costs; and

(k)    Such other and further relief as the Court deems necessary and appropriate.

## DEMAND FOR TRIAL BY JURY

Plaintiffs demand a trial by jury of all issues so triable.

Dated: January 17, 2025

**LEVI & KORSINSKY, LLP**

By: /s/ *Mark S. Reich*
Mark S. Reich (MR-4166)
Gary S. Ishimoto*
Alyssa Tolentino (6195481)
33 Whitehall Street, 17th Floor
New York, NY 10004
Telephone: (212) 363-7500
Facsimile: (212) 363-7171
Email: mreich@zlk.com
Email: gishimoto@zlk.com
Email: atolentino@zlk.com

*Counsel for Plaintiffs*

**pro hac vice* forthcoming